36927. PORIER *et al. v.* SPIVEY.

Decided January 28, 1958—
Rehearing denied February 21, 1958.

*Robert L. Cork, J. Laddie Boatright,* for plaintiffs in error.
*H. B. Edwards, Sr., H. B. Edwards, Jr., W. J. Gibbons,* contra.

FELTON, Chief Judge. ■ The law does not put an absolute duty on an owner to keep his livestock from running at large in a stock-law county. The only duty placed upon such owner is to exercise ordinary care to keep livestock from straying or running at large beyond the limits of the owner's property. "At common law, if, by the negligent keeping of the owner of hogs, they strayed upon the land of another and injured his crops, it was a trespass for which the owner was answerable in damages; and the party injured might either impound the cattle until the owner should satisfy his damages, or he might bring an action for the trespass. This right of action is not altered by the statutes of this State, except that, in counties where the stock law does not obtain, the damage, in order to give a right of action, must be done on land enclosed by a lawful fence. Where the stock law obtains, provision is made for taking up and impounding animals running at large and holding them until damages and costs of keeping and maintenance are paid, and a summary remedy is given for damages by proceeding before a justice of the peace; but this remedy is cumulative and not exclusive, and it does not prevent a resort by the plaintiff to an action to test his rights in the ordinary courts of justice." *Bonner* v. *DeLoach*, 78 *Ga.* 50 (2 S. E. 546). See, also, *Thombley* v. *Hightower*, 52 *Ga. App.* 716, 719 (184 S. E. 331). Apparently the legislature intended that in counties where the stock law had been adopted the common law pertaining to animals straying or running at large should obtain. They pronounced in the acts of 1872 (Ga. L. 1872, p. 34; Code § 62-601) that in any county where the stock law had been adopted the animal described should not be permitted to run at large beyond the limits of the lands of its owner or manager. The act of 1953 (Ga. L. 1953, Jan.-Feb. Sess., pp. 380-381) provides in part: "No owner shall permit livestock to run at large on or stray upon the public roads of this State," and provided for the local adoption of the provisions of the act. The above act was amended by Ga. L. 1953, Nov.-Dec. Sess., p. 395, which provides in part: "No owner shall permit livestock to run at large on or stray upon the public roads of this State, or any property not belonging to the owner of the livestock unless by permission of the owner of such property." This act also provided for local adoption. It can be seen that the requirement set

out in the original act of 1872 and the subsequent acts concerning livestock in stock-law counties was that the owner or manager thereof would not permit livestock to run at large or stray from the limits of the property of the owner or manager. Nowhere was a standard set out as to how or by what means such owner and manager would prohibit livestock from running at large or straying, whether by fencing, staking or any other means.

Originally there was no penal statute regarding the running at large or straying of livestock. Ga. L. 1953, Jan.-Feb. Sess., p. 380 and Ga. L. 1953, Nov.-Dec. Sess., p. 395 made it a misdemeanor for a person to "intentionally or knowingly" permit livestock to stray or run at large. This provision does not make an owner guilty of a misdemeanor where through his *negligence* his livestock strays or runs at large.

The plaintiffs do not allege a violation of the criminal statute by the defendant in intentionally or knowingly permitting his mule to run at large or stray so as to allege negligence per se on the part of the defendant. The complaint is that the defendant negligently allowed the mule to stray or run at large and as pointed out above, there is no negligence per se involved in such a case. This court in *Griffin* v. *Benton,* 92 *Ga. App.* 167 (88 S. E. 2d 287) and *Porier* v. *Spivey,* 94 *Ga. App.* 630 (95 S. E. 2d 712) stated that one who negligently allows his livestock to stray or run at large in a stock-law county was guilty of negligence per se. These statements were erroneous. However, they were obiter dictum and not necessary to a disposition of these cases as in each case the plaintiff alleged that the defendant was negligent in allowing his livestock to stray from his lands, and the petition in each case was sufficient as against a general demurrer to state a cause of action for the damages arising from such alleged negligence.

In cases where in a stock-law county a person is injured or damaged by livestock straying or running at large, there arises a permissible inference authorized prima facie by the mere fact of the running at large by the animal that the owner of the livestock was negligent in allowing the stock to run at large or stray, but when the owner introduces evidence which would authorize a finding that he had exercised ordinary care in the

maintenance of the stock, that permissible inference disappears. The only evidence as to how the mule was fenced and maintained and how he escaped beyond the limits of the owner's land was the testimony of the defendant on both direct and cross-examination. That testimony is as follows: "The first that I heard of this mule getting killed was when Fred DeLoach called me that night. I guess it must have been a quarter of ten, and said someone had run over a mule, and he thought it was mine. I was at home with the children and couldn't leave at that time, and within thirty minutes I went over there and found the other mule in the lot, and I assumed that was the mule that got it. Prior to the collision I had been keeping the mules in a secure enclosure. . . The mule was kept at the home of Robert Henderson and I inspected the fence after the accident. The gate was actually fastened. Those mules had jumped out of the lot fence next to his house and over the front fence, two fences. There is a yard gate in front of his house. The wooden gate is in the back and into a field which is fenced, so I saw actually no reason—the mule is not out when he goes over there. I surmise they jumped over the fence, they had not broken out of the gate. . . I do not recall Robert Henderson coming to me at any time to tell me that the mules had gotten out before and he did not tell me the nail was broken on the latch and he did not tell me to put a new latch on there or a new nail. . . I owned the mule for two years. It is a gentle mule. Robert Henderson worked her. Frankly, I think it was a mare mule and gentle enough to work. It was not a vicious mule and no particular trouble with her. I had owned the other mule eight or ten years and both mules got out. They were both work mules and they were both workable. The fence around the lot where I kept the mules was a regular woven wire field fence with three strands of wire which make it approximately $4\frac{1}{2}$ or 5 feet. I didn't measure it, but I think it is at least 5 feet. It had posts about 6 feet apart, and the gate was wrapped with barbed wire to keep the mules off the gate, so that they wouldn't touch the gate. Every reasonable precaution was taken. I have been a farmer 7 or 8 years and I assumed that the fence was safe. I think that the fence is a safe and secure fence. As to how the

gate was fastened, it was a steel gate, wrapped on top with barbed wire, and, I guess you would call it a log chain—at least a large chain, fastened around the gate and an eighty penny nail driven into the post at an angle and the chain fastened onto the nail. A mule weighs twelve hundred pounds and it is possible for a mule to break it. The mule did not break it in this case. The fence next to the house was bent down—not broken—where the mule went over, and hoof tracks were perceptible to show they had jumped the fence. The other fence they had to jump was into Henderson's yard, and still had a field fence with three strands of barb on it, approximately 5 feet high, to jump. They jumped two fences. I tracked them through the yard to determine how they got out. I couldn't understand how they got out when the gate wasn't open. I opened the gate myself to put the remaining mule back in. That's when I checked to see how they had gotten out. They jumped into the yard that belonged to a colored man, Robert Henderson, and that fence was inside of a field, and they still had to go over the regular field fence to get out, which was a regular woven wire fence which I think is 48 inches plus three strands of barbed wire— possibly 5 feet. All of the fences are good. We try to keep good fences, and I think we succeed. All of the fences are good around the entire field. I think the neighbors would testify that they are at least above the average. . . The wooden gate was in the back of the lot and led into the field, that Robert Henderson was tending. That field had another fence around it. The whole stable is within an enclosed field. I do not remember seeing the gate to the back of the lot that night, but it didn't lead to the outside anyway. There's a fence outside that gate. If the mules had pushed the wooden gate open they would not be able to get outside of the field. They had to go over two fences to get out. The wooden gate is not involved."

Robert Henderson testified on behalf of the defendant in part as follows: "I did not make any statement to Mr. Porier and I did not say those mules had gotten out before. They had not gotten out of the lot before. Since I had had the mules, November 22 was the first time they had gotten out. I did not say anything about the nail coming out of the gate."

This evidence was sufficient to authorize the jury to find that the defendant had exercised ordinary care in the maintenance of the mule and that the mule did not stray or run at large on the night in question due to the negligence of the defendant.

■ In special ground 1 of the amended motion for new trial the plaintiffs complain that the court erred in refusing to let counsel for the plaintiffs ask a certain question of the defendant on cross-examination. Nowhere in the special ground does it appear what that question was and it does not appear that the counsel explained to the court what the question would be and what he expected to prove by such question. Since we have no way of knowing what the question would have been, this court cannot determine whether its exclusion was error and harmful.

■ Special ground 2 of the amended motion complains as follows: "That the court further erred in not allowing the witness J. L. Spivey, Jr., the defendant, on cross-examination to answer the following question, 'Well, the fence wasn't high enough for that type of mule?' Counsel for the defendant stating, 'that's argumentative,' and then counsel for the plaintiff stated 'Here's the law right here if you will allow me to read it' (reading from Code), and the court ruling as follows: 'I don't see anything about the fence in here, the height of the fence. You may proceed to question him about the fence but not in an argumentative capacity, or as a conclusion, but you can ask him about the height of the fence and what kind it was.' " We do not think that the ruling of the court was either error or harmful. The question, if it was a question, was argumentative and was in the nature of a conclusion. The court's ruling specifically did not preclude the plaintiffs' counsel from going into the question of the height of the fence, what kind it was, etc., in relation to the mule and, therefore, the court's ruling did not deprive the plaintiffs of any evidence to which they were entitled.

■ Special ground 3 of the amended motion complains of the following charge: "These statutes I have read to you place a duty on the defendant of using ordinary care to prevent his mules from escaping from the enclosure and getting out on the highway." There was no error in this charge because as stated in division 1 of the opinion, such charge correctly stated the law under the evidence in this case.

The court did not err in denying the amended motion for new trial.

*Judgment affirmed.* *Quillian and Nichols, JJ., concur.*